JASON M. SKAGGS (SBN 202190)
SKAGGS FAUCETTE LLP
530 Lytton Avenue, 2nd Floor
Palo Alto, CA 94301
650.617.3226 (T)
650.644.0200 (F)
jason@skaggsfaucette.com

JOHN C. BROWN (SBN 195804)
CORNERSTONE LAW GROUP
575 Market Street, Suite 3050
San Francisco, CA 94105
(415) 409-8600 (T)
(415) 520-0141 fax
jbrown@cornerlaw.com

Attorneys for Plaintiff
CORNERSTONE LAW GROUP –
EMPLOYMENT/IMMIGRATION,
A PROFESSIONAL CORPORATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CORNERSTONE LAW GROUP – EMPLOYMENT/IMMIGRATION, A PROFESSIONAL CORPORATION,<br><br>Plaintiff<br><br>vs.<br><br>BANK OF SAN FRANCISCO, California corporation, and DOES 1 to 10,<br><br>Defendant. | CASE NO.<br><br>**COMPLAINT**<br><br>1. **Violation of 12 U.S.C.A. § 4001** *et seq.*<br>2. **Failure to Use Ordinary Care**<br>3. **Lack of Good Faith**<br>4. **Negligent Misrepresentation**<br>5. **Equitable estoppel**<br><br>**DEMAND FOR JURY TRIAL** |

## PARTIES

1. Plaintiff Cornerstone Law Group – Employment/Immigration, A Professional Corporation ("Plaintiff" or "Cornerstone") is a California Professional Corporation that maintains its primary place of business in in the City and County of San Francisco.

2. Defendant Bank of San Francisco ("Bank" or "Defendant") is a California corporation that maintains its primary place of business in in the City and County of San Francisco.

3. Plaintiff is ignorant of the true names and capacities, whether individual or corporate, of defendants named herein as DOES 1 through 10, inclusive, and Plaintiff therefore sues these defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege such defendants' true names and capacities when ascertained. Plaintiff is informed and believes, and on that ground alleges, that each of the defendants designated as DOES 1 through 10, inclusive, is liable in some way to Plaintiff for the matters set forth herein.

4. Plaintiff is informed and believes, and on that basis alleges, that at all times relevant hereto each of the defendants was an employee, agent, and representative of each of the other defendants and was, with respect to all matters referred to herein, acting within the purpose and scope of employment, agency, and/or representation. Plaintiff is informed and believes, and on that ground alleges, that each of the defendants has ratified, authorized and/or approved the acts of its respective employees, agents, and/or representatives.

**JURISDICTION AND INTRADISTRICT ASSIGNMENT**

5. This is a civil action over which this Court has original jurisdiction based on a claim arising under federal law pursuant to 28 U.S.C. § 1331(a).

6. The San Francisco Division is the proper Intradistrict Assignment because Defendant is located in the City and County of San Francisco and the incidents at issue occurred in San Francisco.

**GENERAL ALLEGATIONS**

**The Bank Receives Notice of Counterfeit Check and Wire Fraud Scams**

7. On January 8, 2007, the Office of Currency Comptroller ("OCC") issued a Bulletin to banks notifying them of fraudulent cashier's check scams and detailing the relevant Factual Scenarios, Legal Issues, Risks for Depositary Banks, and Recommendations ("the OCC 2007"). The Bulletin discusses various types of scams in which a bank customer receives a purported cashier's check and is instructed to deposit the check and transfer the funds to a third

1  party, often in a foreign country, resulting in loss when the check is not paid.
2  See www.occ.treas.gov/ftp/bulletin/2007-2.html.  Cornerstone is informed and believes that the
3  Bank received this advisory and/or other similar advisories and/or was aware of the substance of
4  these advisories and the potential for such fraud.

5       8. The OCC 2007 recommends that banks "take actions to address the risks to the
6  bank and its customers posed by fraudulent cashier's check schemes" including:

- Address the risks to the bank and its customers posed by fraudulent cashier's check schemes.
- Implement appropriate procedures for processing and cashing cashier's checks that include methods of identifying potentially suspicious items and criteria for placing holds on deposits.
- Consider training or other steps to ensure that relevant personnel are aware of the increasing incidence of fraudulent cashier's checks. At a minimum, bank employees who handle deposits should be aware of the bank's procedures for identifying and handling suspicious cashier's checks.
- Review their deposit agreements to ensure that the agreements appropriately address returned items and mitigate the risks related to fraudulent cashier's checks.
- Be aware of the need to explain the status of deposits to its customers clearly and accurately, particularly in light of the potential for customer confusion, and provide appropriate training or other information to tellers and other relevant personnel to explain the status of deposits to its customers clearly and accurately, particularly in light of the potential for customer confusion.

23       9. The Federal Reserve Board (FRB) issued a similar notice to banks recommending that
24  they advise their clients about counterfeit check scams. See www.philadelphiafed.org/bank-
25  resources/publications/compliance-corner/2007/second-quarter/q2cc1_07 ("FRB 2007").
26  Cornerstone is informed and believes that the Bank received this advisory and/or other similar
27  advisories and was aware of the substance of these advisories and the potential for such fraud.
28

10. The FRB 2007 notice states: "Educating bank customers is the single most important response banks can initiate. Counterfeit cashier's check scams have been successful primarily for two reasons. First, consumers often assume that a cashier's check cannot bounce. Prior to the revolution in desktop publishing, this was a safe assumption. … But now that it has become relatively easy to create a counterfeit cashier's check or money order, customers must be made aware of the risk from these forms of payment and the steps they can take to protect against this risk."

11. The FRB 2007 recommends that a bank's wire department staff be "trained to recognize suspicious transactions in which bank customers are at high risk for counterfeit check scams" so they can notify customers. "Typically, these scams involve some or all of the following characteristics: a deposit made within a few weeks of the requested wire transfer with a certified form of payment (cashier's check, money order, etc.), a customer who rarely makes wire transfers, and a wire transfer recipient outside the United States. When customers are apprised of the risks, they can take appropriate action to protect themselves, and by giving additional attention to wire transfer requests, banks can target the higher risk transactions."

12. On January 17, 2008, the American Bankers Association issued a notice to banks detailing particular fraud scams targeting lawyers. Cornerstone is informed and believes that the Bank received this advisory and/or was aware of its content.

**The Bank Induces Cornerstone to Transfer its Bank Accounts and to Invest in the Bank**

13. Cornerstone's President, Harry G. Lewis, was introduced to the Bank's Vice President John Dzida by his close friend who served on the Bank's advisory board and was an investor in the Bank. After the introduction, Dzida contacted Lewis to schedule a meeting with himself and the Bank's executives.

14. In the fall of 2015, Lewis met with Dzida, the Bank's CEO Edward C. Obuchowski, and its President Wendy A. Ross (collectively "Bank Representatives"). At the meeting, the Bank Representatives encouraged Lewis to move Cornerstone's bank accounts to the Bank and to purchase stock in the Bank. Cornerstone had maintained its bank accounts at Trans Pacific National Bank ("TPNB") since its incorporation.

15. To induce Lewis to move Cornerstone's accounts from TPNB to the Bank and to invest in the Bank, the Bank Representatives told Lewis the Bank distinguished itself from other Banks by providing excellent personal service to small businesses such as Cornerstone. Their "pitch" to Lewis reflected the statement on its website that the Bank "is your partner in business. Our team delivers comprehensive banking solutions for small and mid-sized companies and nonprofits, with an emphasis on client service and an intense focus on your bottom line." This promise resonated with Lewis because he is a small business owner who built his law practice on providing superior service to his clients.

16. To further induce Lewis, the Bank Representatives emphasized that the Bank provided superior on-line banking services and allowed customers to manage accounts through the Bank's secure online banking portal. As an example, they represented that banking transactions could be made electronically without having to physically deposit checks.

17. The Bank Representatives also claimed the Bank had extensive experience working with numerous law firms. This was obviously important to Lewis as a lawyer and because TPNB was well-versed in law firm banking issues. Also, most of the other Cornerstone Law Group lawyers used and were happy with its services.

18. Finally, the Bank represented on its website that it "offers many tools and services to help prevent and detect financial fraud." The Bank Representatives reiterated to Lewis the Bank's security and fraud prevention proficiency at the meeting. The Bank's security and fraud protection capabilities were important to Lewis because, as a lawyer and small business owner, he relied on his bank to advise him of potential security and fraud risks.

19. Based on the Bank's representations, both at the meeting and on its website, about its client service, on-line banking services, experience working with law firms and its security/fraud detection services, Lewis decided to transfer Cornerstone's accounts to the Bank.

20. After the meeting, Dzida provided Lewis with the Bank's form to commence Cornerstone's banking relationship with the Bank, and documents providing information about purchasing stock in the Bank. Cornerstone completed and returned the form to open the bank account.

**Cornerstone Opens an Account at the Bank**

21. Lewis represented Cornerstone in the transaction to open its Operating Account at the Bank. He interacted solely with Dzida in this transaction.

22. On December 4, 2015, Lewis signed the Bank's form signature card to open Cornerstone's Operating Account. Dzida presented Lewis with the signature card at the Bank's office and asked him to sign it. Lewis signed the card and returned it to Dzida. Dzida did not provide Lewis with any of the Bank's disclosures or policies at the time he signed the signature card or at any other time.

23. Of particular relevance, the Bank did not provide Cornerstone with its "Funds Availability Policy Disclosure." The Funds Availability Policy explains the Bank's policy of making funds available to a customer account based on a deposit into the account. It also explains the relationship between "availability [to the Bank's customer] of funds" and the Bank's actual receipt of the funds, or the distinction between "available funds" and "collected balance." More specifically, the Funds Availability Policy explains that the Bank may make funds available to its customers even before the funds have been received and actually "cleared" into the account.

24. On March 31, 2016, Lewis signed the Bank's form signature card to open a second account, hereinafter the "Trust Account." The Trust Account is a fiduciary account maintained by Cornerstone for the benefit of its clients and for the benefit of the State Bar of California. Cornerstone again received no disclosures or other documents from the Bank when it opened the Trust Account, including the Funds Availability Policy.

**The Bank Seizes Funds in Cornerstone's Operating Account**

**After Cornerstone and the Bank Are Defrauded**

25. Cornerstone was retained to represent an individual who claimed to have been wrongfully terminated from his employment. Lewis negotiated a purported settlement of the individual's claims with his purported former employer. The purported former employer provided Cornerstone with a cashier's check in the amount of $280,000 for the settlement payment.

26. On April 4, 2016, Cornerstone deposited the cashier's check into the Trust Account at the Bank.

27. The next day, the Bank stated on its on-line banking portal that there was $280,000 in the Trust Account. Specifically, the Bank's website, by which Cornerstone accessed online information regarding account balances, stated the Trust Account had a "Balance" of "$280,000."

28. The Bank did not qualify or explain its statement that "the amount of money in the Trust Account was $280,000," such as by stating that "the funds were not actually in the account" or "no funds have been collected." The Bank should have explained that "$280,000 is a provision of available funds for Cornerstone's use, which provision the Bank has discretionarily made based on the fact that the Bank considers itself to have security in the event the funds are not received because Cornerstone has funds in its other account."

29. Cornerstone, in response to the purported client's directions and in fulfillment of Lewis's ethical obligation as an attorney, instructed the Bank to wire $277,500 from what the Bank described to be the "balance" of monies in the Trust Account, or the amount of cleared funds in the Trust Account, to the client in Cambodia.

30. Cornerstone submitted an on-line request to the Bank to wire the purported client his money from the Trust Account. A representative of the Bank contacted Lewis's assistant, Jill McCall, to confirm the wire. The representative, however, did not inform McCall that, in actuality, there were no collected funds in the account. Nor did he inform McCall that the Bank would seize the assets in Cornerstone's Operating Account if the check was "returned".

31. Based on the aforementioned on-line statement by the Bank that Cornerstone had a "balance" of funds in the amount of "$280,000" in the Trust Account, and based on the Bank's failure to advise McCall telephonically that the funds had not cleared and in fact were not in the account, McCall caused the wire transfer to be sent.

32. Three days later, the Bank informed Cornerstone that the cashier's check was counterfeit. Dzida and the Bank's Chief Operating Officer Juanna Collin met with McCall that day to discuss the matter. At that meeting, the Bank stated *for the first time* that its

7

COMPLAINT                                           CASE NO.

representation that there was $280,000 in the Trust Account was, in actuality, a only representation that the "funds were available" in the Trust Account that the Bank reserved the right to revoke.

33. Collin told McCall at the meeting that one of the reasons the Bank wired the funds from the Trust Account before the check had "cleared" was because Cornerstone had almost enough money in its operating account to protect the Bank in the event the check was returned.

34. The Bank immediately froze the funds in the Operating Account and, on June 30, 2016, seized $236,448.50 from the Operating Account to partially cover the overdraft on the Trust Account created by the Bank's wire transfer described above.

## CLAIMS

## FIRST CLAIM

**(Violation of 12 U.S.C.A. § 4001 *et seq*.)**

35. Plaintiff hereby incorporates and alleges by reference the preceding paragraphs of this Complaint, inclusive, as if set forth herein in their entirety.

36. The Electronic Funds Availability Act is codified at 12 U.S.C.A. § 4001 *et seq*. and the interpretive regulations are set forth at 12 C.F.R. § 229.10-21 (collectively referred to herein as "EEFA").

37. The EEFA, *inter alia*, requires banks to disclose to customers their policy of making funds available "clearly and conspicuously in writing … in a form that the customer may keep … before opening a new account." 12 U.S.C.A. § 4004 and 12 CFR §§229.15–229.17.

38. The Bank violated the EEFA by failing to provide Cornerstone with its Funds Availability Policy when it opened its Operating Account and its Trust Account.

39. The EFAA also requires banks to train its employees on compliance with the EFAA and to "(1) take such actions as may be necessary fully to inform each employee (who performs duties subject to the requirements of this chapter) of the requirements of this chapter; and (2) establish and maintain procedures reasonably designed to assure and monitor employee compliance with such requirements." 12 U.S.C.A. § 4004(e).

40. Dzida was the Bank representative who was responsible for providing Cornerstone with the Bank's Funds Availability Policy. The Bank violated 12 U.S.C.A. § 4004(e) by failing to train Dzida regarding the requirements of the 12 U.S.C.A. § 4001 *et seq.* and the need to provide customers with the Bank's Funds Availability Policy. Dzida testified that he received no training or any information regarding complying with the requirements of 12 U.S.C.A. § 4001 *et seq*. Indeed, Dzida testified that he was not even aware what documents he normally provides to the Bank's customers when they open a new account; he just hands the customer a stack of documents printed out by another Bank staff member.

41. The Bank further violated 12 U.S.C.A. § 4004(e) by failing to establish and maintain procedures reasonably designed to assure and monitor Dzida's compliance with the statute. Cornerstone is informed and believes that the Bank, at the time of the subject fraud, had no procedures to assure and monitor its employees compliance with the requirements of 12 U.S.C.A. § 4001 *et seq*.

42. The Bank's failure to provide Cornerstone with its Funds Availability Policy was not a "bona fide error" as defined at 12 U.S.C.A. § 4010(c). The "bona fide error" exception to liability can only be asserted when a bank implements "procedures reasonably adapted to avoid any such error." The Bank failed to maintain procedures to ensure that Dzida and its other representatives provide new customers with its Funds Availability Policy.

43. The Bank's failure to provide Cornerstone with its Funds Availability Policy led to Cornerstone's loss. TPNB, consistent with the standard of ordinary care of banks in the San Francisco Bay Area, did allow Cornerstone to release funds from a deposited check until it had actually cleared, especially when there were no other funds in the account as was the case here. Lewis expected the Bank would follow the same practice and not allow Cornerstone to use the funds until the check had actually cleared. Had the Bank provided Cornerstone with its Funds Availability Policy, Cornerstone would have known that the Bank, inconsistent with its experience with TPNB and industry practice, made funds available before the check cleared. If it had known this, Cornerstone would not have requested the wire transfer until it received confirmation that the cashier's check had cleared.

44. Cornerstone, as a proximate result of the Bank's violations of the EFAA, suffered a loss of amount not yet ascertained but of at least $236,000. See 12 U.S.C.A. § 4010; 12 C.F.R. 229.21.

## SECOND CLAIM

### (Failure to Use Ordinary Care)

45. Plaintiff hereby incorporates and alleges by reference the preceding paragraphs of this Complaint necessary to support this claim as if set forth herein in their entirety.

46. The California Commercial Code (CCC) § 4103(a) requires bank to exercise good faith and ordinary care in transactions with their customers. "Ordinary care" is defined as "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." CCC § 3103(a)(7).

47. CCC § 4103(b) states "Federal Reserve regulations and operating circulars, clearing house rules, and the like have the effect of agreements under subdivision (a), whether or not specifically assented to by all parties interested in items handled." The Bank failed to observe reasonable commercial standards for banks operating in the San Francisco Bay Area in failing to take action to guard against, recognize, and prevent the subject fraud scheme.

48. The OCC 2007, incorporated as part of the agreement between Cornerstone and the Bank pursuant to California Commercial Code §4-103(b), placed the Bank on notice of the subject wire fraud scheme. It notified the Bank of a factual scenario in which the target is solicited to act as a "money transfer agent" as Cornerstone was in the subject fraud. It further advised the Bank to: (1) take actions to address the risks to the bank and its customers posed by fraudulent cashier's check schemes; (2) implement appropriate procedures for processing and cashing cashier's checks that include methods of identifying potentially suspicious items and criteria for placing holds on deposits; (3) notify relevant personnel of the increasing incidence of fraudulent cashier's checks and to explain the status of deposits to its customers clearly and accurately, particularly in light of the potential for customer confusion. Cornerstone is informed and believes the Bank took no action to comply with the recommendations of OCC 2007.

49. The FRB 2007, also incorporated as part of the agreement between Cornerstone and the Bank pursuant to California Commercial Code §4-103(b), advised the Bank to educate customers of counterfeit cashier's check scams. The Bank failed to provide Cornerstone with any information about counterfeit cashier's check scams.

50. FRB 2007 also recommended that the Bank train its wire service personnel "to recognize suspicious transactions in which bank customers are at high risk for counterfeit check scams" so they can notify customers.

51. On information and belief, San Francisco Bay Area Banks, in response to the advisories from the federal bank regulatory agencies and the American Bankers Association, began warning law firm customers of potential counterfeit check and wire fraud schemes. An example of these warnings was an article published by First Republic Bank on its website on December 2, 2015 titled "Sophisticated Scammers Target Attorneys: How to Avoid the Retainer Fee Scam." This article warned of the very Retainer Fee Sam perpetrated on Cornerstone and the Bank, identified the warning signs and advised how to avoid falling victim to such a scam. See https://www.firstrepublic.com/articles-insights/life-money/protect-against-fraud/sophisticated-scammers-target-attorneys-how-to-avoid-the-retainer-fee-scam).

52. The fraudulent cashier's check at issue here was issued by an out-of-state bank and deposited into an account opened less than a week before; the next day, a request was made to wire all the funds in the account to Cambodia. Consistent with industry practice and its duty of ordinary care under the Commercial Code, the Bank's staff should have been trained to recognize the suspicious transaction and notify Cornerstone when it attempted to make the wire transfer that the check had not cleared and there were not sufficient funds in the Trust Account to cover the wire transfer. A Bank representative called Ms. McCall to confirm the wire but failed to notify McCall that the provision of funds in the Trust Account was conditional because the check had not actually cleared. Cornerstone is informed and believes the Bank failed to train its staff to recognize suspicious transactions in which bank customers are at high risk for counterfeit check scams.

11

COMPLAINT                                    CASE NO.

1   53.   The Bank also failed to meet the standard of ordinary care by not verifying the authenticity of the counterfeit check contrary to the practice of banks in the San Francisco Bay Area when such indicia of fraud are present. The cashier's check was a certified form of payment for a large sum deposited within a day of a requested wire transfer from an account with no funds in it to recipient outside the United States.  There were, therefore, numerous indicia that the check was counterfeit. Due to these numerous indicia of a fraudulent transaction, the Bank should have confirmed the validity of the cashier's check deposited into the account by contacting the bank on which it was drawn.

54.   The Bank also failed to meet the standard of ordinary care by allowing Cornerstone to wire more funds out of the Trust Account than the amount of collected funds held in the Trust Account, as this is inconsistent with the practices of other banks and industry standards.  This failure was particularly egregious in light of the circumstances set forth above.

55.   Cornerstone, as a proximate result of the Bank's failure to use ordinary care, has been damaged in an amount not yet ascertained but in excess of $236,000.

### THIRD CLAIM

### (Lack of Good Faith)

56.   Plaintiff hereby incorporates and alleges by reference the preceding paragraphs of this Complaint necessary to support this claim as if set forth herein in their entirety.

57.   The CCC provides that "[e]very contract or duty within this code imposes an obligation of good faith in its performance and enforcement."  CCC §1304.  "Good faith" in the context of the Commercial Code "means honesty in fact and the observance of reasonable commercial standards of fair dealing."  CCC §1201(b)(20).

58.   The Bank failed to observe honesty in fact and the observance of reasonable commercial standards of fair dealing with respect to the conduct alleged herein.

59.   The OCC 2007, incorporated as part of the agreement between Cornerstone and the Bank pursuant to California Commercial Code §4-103(b), placed the Bank on notice of the subject wire fraud scheme.  It notified the Bank of a factual scenario in which the target is solicited to act as a "money transfer agent" as Cornerstone was in the subject fraud.  It further

1 advised the Bank to: (1) take actions to address the risks to the bank and its customers posed by
2 fraudulent cashier's check schemes; (2) implement appropriate procedures for processing and
3 cashing cashier's checks that include methods of identifying potentially suspicious items and
4 criteria for placing holds on deposits; (3) notify relevant personnel of the increasing incidence
5 of fraudulent cashier's checks and to explain the status of deposits to its customers clearly and
6 accurately, particularly in light of the potential for customer confusion. Cornerstone is informed
7 and believes the Bank took no action to comply with the recommendations of OCC 2007.

8      60.    The FRB 2007, also incorporated as part of the agreement between Cornerstone and
9 the Bank pursuant to California Commercial Code §4-103(b), advised the Bank to educate
10 customers of counterfeit cashier's check scams. The Bank failed to provide Cornerstone with any
11 information about counterfeit cashier's check scams.

12      61.    FRB 2007 also recommended that the Bank train its wire service personnel "to
13 recognize suspicious transactions in which bank customers are at high risk for counterfeit check
14 scams" so they can notify customers.

15      62.    On information and belief, San Francisco Bay Area Banks, and banks in general,
16 in response to the advisories from the federal bank regulatory agencies and the American
17 Bankers Association, began warning law firm customers of potential counterfeit check and wire
18 fraud schemes. An example of these warnings was an article published by First Republic Bank
19 on its website on December 2, 2015 titled "Sophisticated Scammers Target Attorneys: How to
20 Avoid the Retainer Fee Scam." This article warned of the very Retainer Fee Sam perpetrated on
21 Cornerstone and the Bank, identified the warning signs and advised how to avoid falling victim
22 to such a scam. See https://www.firstrepublic.com/articles-insights/life-money/protect-against-
23 fraud/sophisticated-scammers-target-attorneys-how-to-avoid-the-retainer-fee-scam).

24      63.    The fraudulent cashier's check at issue here was issued by an out-of-state bank and
25 deposited into an account opened less than a week before; the next day, a request was made to
26 wire all the funds in the account to Cambodia. Consistent with industry practice and its duty of
27 good faith under the Commercial Code, the Bank's staff should have been trained to recognize
28 the suspicious transaction and notify Cornerstone when it requested the wire transfer and/or to at

13
COMPLAINT                                         CASE NO.

1  least notify Cornerstone when it attempted to make the wire transfer that the check had not
2  cleared and there were not sufficient funds in the Trust Account to cover the wire transfer.  A
3  Bank representative called Ms. McCall to confirm the wire but failed to notify McCall that the
4  provision of funds in the Trust Account was conditional because the check had not actually
5  cleared. Cornerstone is informed and believes the Bank failed to train its staff to recognize
6  suspicious transactions in which bank customers are at high risk for counterfeit check scams.

7  64.  The Bank also failed to meet its duty of good faith by not verifying the authenticity
8  of the counterfeit check contrary to the practice of banks in the San Francisco Bay Area when
9  such indicia of fraud are present. The cashier's check was a certified form of payment for a
10 large sum deposited within a day of a requested wire transfer from an account with no funds in
11 it to recipient outside the United States.  There were, therefore, numerous indicia that the check
12 was counterfeit. Due to these numerous indicia of a fraudulent transaction, the Bank should
13 have confirmed the validity of the cashier's check deposited into the account by contacting the
14 bank on which it was drawn.

15 65.  The Bank also failed to meet its duty of good faith by allowing Cornerstone to wire
16 more funds out of the Trust Account than the amount of collected funds held in the Trust
17 Account, as this is inconsistent with the practices of other banks and industry standards.  This
18 failure was particularly egregious in light of the circumstances set forth above.

19 66.  Cornerstone, as a proximate result of the Bank's failure to use ordinary care, has
20 been damaged in an amount not yet ascertained but in excess of $236,000.

**FOURTH CLAIM**

**(Negligent Misrepresentation)**

23 67.  Plaintiff hereby incorporates and alleges by reference the preceding paragraphs of
24 this Complaint necessary to support this claim as if set forth herein in their entirety.

25 68.  The day after the counterfeit check was deposited in the Trust Account, the Bank
26 represented to Cornerstone on its on-line banking portal that there was a "balance" of
27 "$280,000" in the Trust Account. The Bank's unqualified statement constituted a representation
28 that $280,000 was in the account. The Bank did not provide Cornerstone any information to

14
COMPLAINT                                                    CASE NO.

1 indicate that $280,000 was merely a statement of available funds, which the Bank could revoke. The industry standard for banks is to explain that statements regarding "available funds" are not the same as a statement of "collected balance."

69. The Bank's representation that there was a "balance" of $280,000 in the account was false because there was no money in the account; the Bank did not consider the funds to have cleared and the funds had not, in fact, cleared. Rather, the Bank was simply making the funds "available."

70. The Bank suppressed facts when it gave Cornerstone other facts likely to mislead for want of communication of the suppressed facts. Specifically, the Bank knew that the $280,000 provision of funds to the Trust Account based on the $280,000 cashier's check could be debited from the account based on the fact that the check could be fraudulent or otherwise might not clear.

71. The Bank nevertheless stated to Cornerstone that it had a "balance" of "$280,000" in the account, thereby misleading Cornerstone into believing that the funds from the cashier's check it had deposited could not and would not be returned.

72. Even if the Bank did not have a duty to state to Cornerstone that it had $280,000 in the account, once it did so, it had a duty to convey accurate information. It nevertheless suppressed the important fact that materially explained the statement, i.e., the check could be returned so Cornerstone was at risk if it used or distributed funds that were not actually in the account but rather simply "available."

73. The Bank intended to induce Cornerstone to act by making the partial misleading disclosure. To obtain Cornerstone's business, the Bank emphasized its "superior on-line banking services and the ability to enable customers to manage their accounts through the Bank's secure online banking portal". This purported "superior" service includes the provision of clear and accurate information on The Bank's online banking portal. The Bank intended to induce Cornerstone to use and rely on the information provided on the secure online banking portal "to manage [its] accounts," and it intended to induce Cornerstone to continue doing business with it by publishing such information.

15
COMPLAINT                                                        CASE NO.

74. At the time the Bank made this representation and at the time Cornerstone took action in reliance on it, Cornerstone was ignorant of the falsity of the representation, and believed it to be true.

75. Cornerstone, in justifiable reliance on the Bank's representation that $280,000 was in the Trust Account, and in fulfillment of its reasonably perceived ethical obligation to its purported client, instructed the Bank to wire the money to the client.

76. Cornerstone was harmed and its reliance on the Bank's representation was a substantial factor in its loss of amount not yet ascertained but of at least $236,000.

## FIFTH CLAIM

### (Equitable Estoppel)

77. Plaintiff hereby incorporates and alleges by reference the preceding paragraphs of this Complaint necessary to support this claim as if set forth herein in their entirety.

78. The day after the counterfeit check was deposited in the Trust Account, the Bank represented to Cornerstone on its on-line banking portal that there was a "balance" of "$280,000" in the Trust Account. The Bank's unqualified statement constituted a representation that $280,000 was in the account. The Bank did not provide Cornerstone any information to indicate that $280,000 was a statement of available funds, which the Bank could revoke.

79. Cornerstone, in justifiable reliance on the Bank's representation that $280,000 was in the Trust Account, and in fulfillment of its reasonably perceived ethical obligation to its client, instructed the Bank to wire the money to the client.

80. The Bank's representation that there was a balance of $280,000 in the account was false because there was no money in the account and because the bank did not consider the funds to have cleared and the funds had not, in fact, cleared, but, rather, the Bank was simply making the funds "available."

81. The Bank is therefore estopped from asserting against Cornerstone that Cornerstone is responsible for the overdraft on the Trust Account caused by the return of the counterfeit check. The Bank's seizure of money from Cornerstone's operating account to cover the overdraft was improper, as the loss was caused by the Bank's misrepresentation.

82. Due to its reliance on the Bank's representation, Cornerstone suffered a loss in amount not yet ascertained but of at least $236,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant and seeks an award for:

1. Actual damages of at least $236,448.50;
2. General damages for loss of use of the funds in an amount to be proven;
3. Attorneys' fees and costs pursuant 12 U.S.C.A. § 4010;
4. Costs of suit; and
5. Such other relief that the Court deems just and proper.

DATED:  March 15, 2017            SKAGGS FAUCETTE LLP


By: _____/s/_____
         JASON M. SKAGGS
Attorneys for Plaintiff Cornerstone Law Group,
Employment/Immigration, A Professional Corporation

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 15, 2017							Respectfully submitted,

								*/s/*
								Jason Skaggs
								CA State Bar No. 202190
								SKAGGS FAUCETTE LLP
								530 Lytton Avenue, 2nd Floor
								Palo Alto, CA 94301
								(650) 617-3226
								jason@skaggsfaucette.com